**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1337-18T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ORLANDO MATOS, a/k/a
JOSE APONTE, BEBO
MATOS, and ORLANDO
MATOS-LUGUS,

     Defendant-Appellant.

_____

Argued September 21, 2020 - Decided December 15, 2020

Before Judges Currier, Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 17-03-0386.

Anastasia Stylianou, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Anastasia Stylianou, on the briefs).

Steven Cuttonaro, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney

General, attorney; Steven Cuttonaro, of counsel and on the brief).

PER CURIAM

Defendant appeals from his convictions and sentence following a jury trial in August and September 2018. After a review of his contentions in light of the record and applicable principles of law, we affirm.

I.

We derive our facts from the testimony elicited at trial. On the day of these events, Sanjay and Priti Kaple were working in their store – a mini market. A store patron, Mariano Soto, was sitting near the front counter. Two men entered the store. The first man, later identified as defendant, was wearing a red baseball hat underneath a blue hoodie with white lettering that covered his face. The second man, identified as co-defendant Efrain Fernandez, was wearing a black baseball hat and a black hooded jacket that covered his face.

Sanjay testified that defendant approached Soto and pointed a small black gun[1] at Soto's face and chest and demanded money. After Soto told defendant he did not have any money, defendant approached Sanjay and told him to open

---

[1] It was later discovered the gun was fake.

the cash register. After a brief struggle, defendant ripped a gold chain necklace from Sanjay's neck.

While defendant and Sanjay were struggling, Soto quickly left the store and used a phone at a restaurant next door to call 9-1-1. At that time, Soto stated he did not recognize either assailant.

In the meantime, Fernandez approached Priti from behind, and demanded she give him her gold chain necklace. When she refused, he tore it off her neck. Priti fell to the ground. Fernandez then walked toward the front entrance of the store and told defendant that they should leave. Throughout this time, defendant continued to point the gun at the Kaples.

After defendant tore off Sanjay's necklace, he approached the cash register and unsuccessfully attempted to open it. While defendant was distracted with the register, Sanjay ran toward the door and pushed Fernandez out of the store and onto the street where a struggle ensued. Priti ran after Sanjay out of the store. Defendant then ran after them.

During the struggle, Sanjay and Priti tore off Fernandez's hoodie and hat. They immediately recognized him as a frequent patron of their store but did not know his name. Because they could not see defendant's face, they were unable to identify him.

A-1337-18T4

As defendant and Fernandez ran to a waiting car driven by a third man, co-defendant Yorvin Caba-Placencia, Fernandez left his hoodie and hat behind. Sanjay chased after the men and saw them get into the car. He was able to note a partial license plate.

After the assailants drove off, Sanjay flagged down Perth Amboy police officer Javier Morillo, who was responding to the area in search of the suspects and their vehicle. At the same time, Priti re-entered the store and called 9-1-1. Other callers to 9-1-1 described the suspects as well.

Additional police officers responded to the scene and took statements from the victims. They also retrieved surveillance video from the store and nearby residences that captured the events. One piece of footage shows defendant and Fernandez getting out of a car, walking down the street toward the Kaples' store, and, minutes later, running back to the vehicle. The video also shows Fernandez returning to the vehicle after the robbery without the jacket he was wearing when he got out of the car. The detectives also retrieved a San Antonio Spurs hat and a black jacket lying on the ground outside the store.

Later that evening, the police pulled over the car seen in the video and described by Sanjay as the one in which defendant and Fernandez were riding in when they left the scene. Caba-Placencia was driving the car and consented

to a search of the car, during which the police found a red hat in the back seat. Caba-Placencia was arrested and charged with conspiracy to commit robbery.

Two weeks after the robbery, Sanjay reported to police that a customer told him that he knew the identity of one of the assailants. The customer provided the suspect's Facebook name of "Efra Picatay." Sanjay gave Detective Luis Corro pictures from the Facebook page and told Corro the man was a frequent patron of the store. Based on these photographs, Corro identified Fernandez as a suspect.

Later that day, Fernandez was questioned by police regarding his participation in the robbery.[2] Fernandez confessed to police that he, along with defendant and Caba-Placencia, planned and committed the robbery; Fernandez and defendant committed the robbery and Caba-Placencia was the getaway driver.

Fernandez referred to defendant by a nickname, "Bebo." He said he had known him for about two months and Bebo had committed the robbery with him.[3] Based on this information, police located and arrested defendant.

---

[2] Fernandez was already in custody after being arrested for unrelated charges.

[3] During trial, Fernandez testified that defendant was his cousin.

DNA testing revealed: defendant's and Fernandez's DNA were found on the black Spurs baseball hat found at the crime scene, defendant's DNA was found on the red hat and Fernandez's DNA was found on the black jacket.

Prior to trial, the State offered Fernandez a favorable plea deal in exchange for his testimony at trial against defendant and Caba-Placencia. In June 2018, Fernandez pled guilty to first-degree robbery and, in an unrelated case, to second-degree attempted armed burglary and fourth-degree unlawful possession of a weapon. The agreement recommended a sentence of six years' imprisonment with an eighty-five percent parole disqualifier.[4] The plea was conditioned on Fernandez providing truthful testimony in the trial against his co-defendants. Fernandez was a witness for the State during the trial.

On the second to last day of trial, the judge advised the parties he would conduct a charge conference the following morning. He inquired whether the charge should include theft from a person[5] as a lesser-included offense for robbery. Defense counsel stated he was not seeking any lesser-included offense charges.

---

[4] Fernandez was sentenced according to the plea agreement on November 9, 2018.

[5] N.J.S.A. 2C:20-2(b)(2)(d).

The following day, the judge again addressed the issue, advising he did not think the facts supported a charge on any lesser-included offenses:

> So -- and I -- the way the facts came out, and let me know, I don't think anybody is going to disagree. I know we always have to consider theft from a person, aggravated assault, but I think the way the facts came out on this case, it leads us towards a clear path of this was an attempt, a focus on a robbery, a focus on an armed robbery, and a conspiracy to commit same, not a focus on committing an aggravated assault or a theft from a person. Nothing in the testimony that would lead me to think that anybody had that particular intent. So that's why I'm not going with the lesser includeds, and I know, [defense counsel], you indicated you weren't asking for any.

Defense counsel confirmed he was not requesting a charge for any lesser-included offenses.

During its instructions to the jury, the court gave the model jury charge on cooperating witnesses for the evaluation of Fernandez's testimony:

> The law requires that the testimony of such a witness be given careful scrutiny. In weighing his testimony, therefore, you may consider whether . . . Fernandez has a special interest in the outcome of the case and whether his testimony was influenced by the hope of expecting or expectation of any favorable treatment or reward or by any feelings of revenge or reprisal. If you believe this witness to be credible and worthy of belief, you have the right to convict the defendants on his testimony alone provided, of course, that upon

7

> consideration of the whole case, you are satisfied
> beyond a reasonable doubt of the defendant's guilt.[6]

The judge also charged the jury regarding prior inconsistent statements of witnesses. See Model Jury Charges (Criminal), "Prior Contradictory Statements of Witnesses (Not Defendant)" (approved May 23, 1994).

## II.

The jury convicted defendant on the charges of second-degree conspiracy to commit armed robbery, first-degree armed robbery, and fourth-degree possession of an imitation firearm. He was acquitted of the third-degree terroristic threats charge.

The State moved to sentence defendant to an extended term, pursuant to N.J.S.A. 2C:44-3(a), as a persistent offender. Defense counsel stipulated defendant was eligible for an extended term but asserted an extended term was not warranted because Fernandez was the mastermind behind the robbery. Counsel requested the court sentence defendant at the bottom of the extended term range.

In granting the State's motion to sentence defendant to an extended term, the court stated:

---

[6] See Model Jury Charges (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006).

The defendant presents himself today as a 32-year-old male whose first contact with the criminal justice system was in 2005. He has seven contacts with the municipal court, and 11 findings of guilt. He has 11 contacts with the Superior Court resulting in 15 Superior Court convictions.

Now, these 15 convictions were accumulated as a result of four separate dates where he pled guilty to various charges, and four separate dates that he received a sentence.

As recognized by [defense counsel], just based on the background alone, [defendant] qualifies for extended term as a persistent offender, which would then change his range for sentencing from ten to 20 years to 20 to life, still with the restrictions of the No Early Release Act.

[Defendant] is young, he's 32. That weighs in his favor against an extended term sentence given that . . . the [c]ourt would think that a 32-year-old, you would have to think there is some belief that he still has a chance to make something of his life once he finishes a sentence for a crime that he's been convicted of. But the problem with [defendant] is this, unabated, without any deterrence, without anything influencing him to resist engaging in criminal activity since 2005 without fail every year, except for the years when he was serving a prison sentence, he's engaged in criminal behavior, significant criminal behavior, starting from, if you could call receiving stolen property a mild offense, you would do that only when you compare it to the assaults, the aggravated assaults, the assaults with a firearm, the handgun charges that he was charged with in 2007, a plea of guilty to an aggravated assault with causing bodily injury with a deadly weapon resulted in a period of probation which was subsequently revoked, and he was re-sentenced on a [violation of probation] to three

9

years incarceration on October 20th of 2008 after having first pled guilty on [June 7, 2007] and being sentenced initially to probation on [August 27, 2007].

. . . .

[As to the first-degree armed robbery count (count two),] the [c]ourt grants the State's application for an extended term sentence, because there is an absolute need to impress upon [defendant], and to be quite honest if for no other reason to keep him off the streets and make the streets safer from his brand of violence for a period of time far beyond the seven or the three years that he would receive . . . and [an] extended term sentence is warranted because [defendant] has clearly proven himself to be over the past 12 years to be someone who has escalated his behavior into violent behavior and puts anyone at risk for whatever gain he deems is necessary for himself, whether it be personal or financial, that is clear. And it's a level of violence that is about as significant as we can have, to be quite honest, short of committing a homicide.

. . . .

There is an absolute need to protect society from [defendant's] behavior, which remains uncontrolled and [sic] by the prior prison sentences imposed at a minimum on two separate occasions.

[emphasis added.]

The court then sentenced defendant to an extended term of twenty-five years' imprisonment with an eighty-five percent parole disqualifier pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for the armed robbery

conviction (count two), and a concurrent seven-year imprisonment term for the conspiracy conviction. The court merged the count for possession of an imitation firearm (count three) with the count for armed robbery (count two).

### III.

On appeal, defendant raises the following arguments:

> I. THE TRIAL COURT DENIED [DEFENDANT] A FAIR TRIAL AND DUE PROCESS OF LAW BY FAILING TO ALLOW THE JURY TO CONSIDER THEFT AS AN ALTERNATIVE VERDICT TO ROBBERY
>
> II. THE TRIAL COURT FAILED TO INSTRUCT JURORS TO EVALUATE WITH CAUTION THE ALLEGATIONS THAT [DEFENDANT] IN UNRECORDED ORAL REMARKS, CONSPIRED WITH MR. FERNANDEZ TO COMMIT THEFT
>
> III. THE STATE'S HEAVY RELIANCE ON INHERENTLY UNRELIABLE JAILHOUSE SNITCH TESTIMONY AT TRIAL IS INCOMPATIBLE WITH THE DUE PROCESS RIGHTS GUARANTEED UNDER THE NEW JERSEY CONSTITUTION AND THE COURT FAILED TO PROPERLY INSTRUCT THE JURY ON HOW TO EVALUATE SUCH TESTIMONY
>
> IV. [DEFENDANT'S] DISCRETIONARY TWENTY-FIVE-YEAR EXTENDED TERM SENTENCE SHOULD BE VACATED OR REDUCED BECAUSE IT WAS MANIFESTLY EXCESSIVE

A.

We begin by addressing defendant's contention that the trial court erred in not charging the jury on theft as a lesser-included charge of robbery. Defendant relies on State v. Sein, 124 N.J. 209, 211 (1991), arguing that because the use of force was directed at removing Sanjay's necklace instead of at Sanjay's person, there was a rational basis to support a jury charge for theft. We disagree.

In Sein, the defendant reached across the victim to grab her purse. Ibid. There was no evidence that "the taking of [her] purse was accompanied by the use of force against her person . . . ." Ibid. The Court contrasted the elements of robbery, N.J.S.A. 2C:15-1(a) with those of theft, N.J.S.A. 2C:20-3 and found that "robbery requires more force than that necessary merely to snatch the object." Id. at 217. The Court found a purse-snatching that involved some degree of force to wrest the object from the victim would fall within the ambit of the robbery statute. Ibid.

N.J.S.A. 2C:15-1(a) provides that:

> A person is guilty of robbery if, in the course of committing a theft, he:
>
> > (1) Inflicts bodily injury or uses force upon another; or

> (2) Threatens another with or purposely puts him in fear of immediate bodily injury; or
>
> (3) Commits or threatens immediately to commit any crime of the first or second degree.
>
> An act shall be deemed to be included in the phrase "in the course of committing a theft" if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission.

"Theft is defined, generally, as the unlawful taking or exercise of unlawful control over property of another with purpose to deprive him thereof . . . N.J.S.A. 2C:20-3." State v. Farrad, 164 N.J. 247, 257 (2000) (quoting State v. Carlos, 187 N.J. Super. 406, 412 (App. Div. 1982)).

Robbery is elevated to a crime of the first-degree "if in the course of committing the theft the actor attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon." N.J.S.A. 2C:15-1(b). The definition of a "deadly weapon" includes simulation of a deadly weapon, "enabling a defendant's conviction of first-degree armed robbery to be based on . . . simulation of the possession of such a weapon." State v. Chapland, 187 N.J. 275, 283 (2006). Indeed,

13

"[d]eadly weapon" means any firearm or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used, is known to be capable of producing death or serious bodily injury or which in the manner it is fashioned would lead the victim reasonably to believe it to be capable of producing death or serious bodily injury . . . .

[N.J.S.A. 2C:11-1(c).]

Our Supreme Court has stated the definition of "[d]eadly weapon" under N.J.S.A. 2C:11-1(c) requires either an "unambiguous simulation of a weapon" or a combination of words and gestures that "complete the impression of a concealed weapon[.]" State v. Nero, 195 N.J. 397, 400 (2008) (alteration in original) (quoting Chapland, 187 N.J. at 292). However, "[a] threat or reference to a deadly weapon alone is not enough." State v. Hutson, 107 N.J. 222, 227 (1987). To convict on a charge of armed robbery, the jury must find the defendant used an object in a manner such that the victim "reasonably believes it to be capable of causing serious bodily harm or death." Id. at 228 (emphasis in original). This requires a "link between the threat and the object viewed by the victim." Ibid.

Here, defendant did not request that the court instruct the jury on theft as a lesser-included offense. To the contrary, defense counsel explicitly stated he did not want the court to charge the lesser-included offense. Where an error has

14

not been brought to the trial court's attention, we will not reverse on the ground of such error unless the error is "clearly capable of producing an unjust result." R. 2:10-2. "When a party does not object to a jury instruction, [we] review[] the instruction for plain error." State v. Montalvo, 229 N.J. 300, 320 (2017).

Even if there is no request by a party to charge the jury on a lesser-included offense, a trial court has an independent, non-delegable duty to instruct a jury on such a charge "when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense." State v. Jenkins, 178 N.J. 347, 361 (2004) (citations omitted). Therefore, in order for the trial court here to charge the jury with theft as a lesser-included offense, the facts adduced at trial had to clearly indicate that a jury could have convicted defendant of theft while acquitting him of robbery.

We discern no error regarding the charge because there was no rational basis to charge the jury on theft as a lesser-included offense. The surveillance video evidence shows defendant entered the store with his face covered to conceal his identity, clearly holding a gun in his hand. These actions support a finding that defendant threatened the victims inside the store with immediate use of a deadly weapon, reasonably putting them in fear of immediate bodily

injury. Sanjay and Soto believed the gun was real, describing it as a "small black gun" that appeared to be made of metal.

Defendant used the gun to render the victims in fear of him and to demand money from them by repeatedly pointing it at them and shoving it into their bodies. Defendant approached Soto first, grabbed his shirt collar, and pointed the firearm into his chest demanding money. Soto clearly believed the gun was real, explaining he quickly escaped from the store as "[he] was afraid that guy might shoot [him]."

After defendant was unsuccessful in robbing Soto, he went behind the register, pointing the gun at Sanjay and cornering him. Defendant grappled with Sanjay, grabbing his neck from behind and pointing the gun at Sanjay's chest to prevent Sanjay's escape.

The surveillance video shows Sanjay is visibly frightened – with his eyes wide and hands up as he struggles to escape from defendant, who is repeatedly shoving the gun into Sanjay's body. At some point during their struggle, defendant yanked the chain off Sanjay's neck. The gun never leaves defendant's hand.

The evidence does not support defendant's claim that the force was directed only at the jewelry. While holding the gun, defendant grabbed Sanjay's

16

clothes and body as they struggled, eventually ripping off his chain necklace. That force plainly was directed at the victim, not the chain.

We are satisfied the evidence presented at trial did not clearly indicate that a jury could have convicted defendant of theft while acquitting him of robbery. See Jenkins, 178 N.J. at 361. Because the facts supported the charge of first-degree robbery, the trial court did not err in failing to instruct on the lesser-included charge of theft.

B.

During trial, Fernandez testified that after he told defendant he needed money, defendant agreed to help him rob the mini mart. Defendant asserts this statement established he conspired to commit a robbery or theft. Defendant contends the trial court erred by failing to sua sponte give a Hampton[7] and Kociolek[8] charge and the model jury charge for alleged statements made by a defendant. See Model Jury Charges (Criminal), "Statements of Defendant – Allegedly Made" (rev. Jun. 14, 2010). Without these instructions, and coupled with Fernandez's disputed credibility, defendant contends the jury was unable to

---

[7] State v. Hampton, 61 N.J. 250 (1972).

[8] State v. Kociolek, 23 N.J. 400 (1957).

critically assess whether he made the incriminating oral statements to Fernandez in which he agreed to help Fernandez commit a robbery.

Defendant further argues that although the court provided a general instruction concerning the jury's role in assessing the credibility of witnesses, a specific instruction regarding Fernandez's statements was necessary because the court's preclusion of cross-examination questions regarding Fernandez's prior inconsistent statements prevented defendant from fully challenging Fernandez's credibility.

Because defendant did not request these specific charges at trial or raise an error regarding the jury charge, we review for plain error. See State v. Funderburg, 225 N.J. 66, 79 (2016). "Under that standard, [this court] disregard[s] any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2).

A trial court should provide a Hampton charge "[w]hether requested or not, whenever a defendant's oral or written statements, admissions, or confessions are introduced in evidence . . . ." State v. Jordan, 147 N.J. 409, 425 (1997). A jury "shall be instructed that they should decide whether . . . the defendant's [statement] is true[,]" and if they conclude that it is "not true, then

they must . . . disregard it for purposes of discharging their function as fact finders on the ultimate issue of guilt or innocence." Hampton, 61 N.J. at 272.

Hampton applies where the inculpatory statement is made to police. Here, Fernandez relayed to the police a statement made to him by defendant. Therefore, a Hampton charge was not required. See State v. Baldwin, 296 N.J. Super. 391, 398 (App. Div. 1997) (holding that "a special cautionary instruction is not required when a defendant has allegedly made a voluntary inculpatory statement to a non-police witness without being subjected to any form of physical or psychological pressure").

Under these circumstances, the trial court could have provided the jury with a Kociolek charge, used whenever a witness at trial testifies regarding a defendant's oral statements. 23 N.J. at 421. The jury is instructed that it "'should receive, weigh and consider such evidence with caution,' in view of the generally recognized risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer." Ibid. "[T]he Kociolek charge should be given whether requested or not." Jordan, 147 N.J. at 428.

However, a Kociolek charge need not be provided to the jury where "an alleged oral inculpatory statement was not made in response to police questioning, and there is no genuine issue regarding its contents, . . . because

the only question the jury must determine is whether the defendant actually made the alleged inculpatory statement." Baldwin, 296 N.J. Super. at 401-02.

Moreover, the failure to give the Hampton and Kociolek charges is not always reversible error. Jordan, 147 N.J. at 425, 428. We will only reverse when omission of the charges was clearly capable of producing an unjust result in the context of the entire case. Id. at 425, 429. If the statements were unnecessary to prove the defendant's guilt "because there is other evidence that clearly establishes guilt, or . . . the defendant has acknowledged the truth of his statement," the failure to give a Hampton charge will not require reversal. Id. at 425-26. Likewise, whether the failure to give the Kociolek charge constitutes plain error, "will depend on the facts of each case." Id. at 428.

Here, as stated, defendant made the statement to Fernandez and not in response to police questioning. There was no dispute as to the content of the statements at trial, just a denial that defendant made the statement. See Baldwin, 296 N.J. Super. at 401-02. Moreover, defendant's counsel thoroughly cross-examined Fernandez concerning his testimony about the robbery and his statement to police and argued in summation that Fernandez's testimony was unreliable.

A-1337-18T4

The trial judge also instructed the jury on how to evaluate the credibility of witnesses and gave a cooperating witness charge. A prior inconsistent statement instruction was also read to the jury, directing the jury to scrutinize Fernandez's testimony in light of the inconsistencies in his statement to police and trial testimony.

Finally, any error regarding these charges did not have the capacity to produce an unjust result because defense counsel contested the reliability of defendant's statement to Fernandez and there was other evidence – surveillance footage and DNA evidence – that clearly established defendant's guilt. See State v. Feaster, 156 N.J. 1, 72-73 (1998) (holding there was no plain error in the trial court's failure to give a Kociolek charge even though the defendant's incriminating oral statements were "at the heart of the State's case against defendant"); R. 2:10-2.

## C.

Defendant challenges Fernandez's testimony on another front not raised at trial – asserting "the inherently unreliable jailhouse snitch testimony" was a violation of his due process rights. He supports his argument with several secondary sources not binding on this court, and a footnote in the dissenting opinion in State v. Feaster, 165 N.J. 388, 460 n.8 (2000) (Long, J., dissenting)

(citations omitted) ("Testimony by jailhouse informants is especially problematic in and of itself."). He also cites to several federal and out-of-state cases.

Defendant acknowledges the United States Supreme Court has already held that the United States Constitution does not bar the introduction of cooperating witness testimony. See Kansas v. Ventris, 556 U.S. 586, 594 (2009).

Therefore, he contends if this court finds Fernandez's testimony is not so inherently unreliable to be constitutionally barred, we should nevertheless find the cooperating witness model jury charge is insufficient and reverse on that basis. See Model Jury Charges (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006). We decline to so find.

Under our case law, the State may condition a plea agreement on a defendant's agreement to give truthful testimony as the State's witness. State v. Long, 119 N.J. 439, 489 (1990). Such cooperating witness testimony is routinely admitted by courts. Ibid. (citing Hoffa v. United States, 385 U.S. 293 (1966)). However, "the risk of perjury must be balanced against the potential contribution of truthful testimony." Ibid. (citing United States v. Dailey, 759 F.2d 192 (1st Cir. 1985)). Therefore, the disclosure of a plea agreement with a

cooperating witness "allow[s] 'the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.'" Ibid. (quoting Hoffa, 385 U.S. at 311).

It is the jury's province to decide issues of credibility. "[T]he jury is charged with making credibility determinations based on ordinary experiences of life and common knowledge about human nature, as well as upon observations of the demeanor and character of the witness." State v. Jamerson, 153 N.J. 318, 341 (1998) (citing State v. J.Q., 252 N.J. Super. 11, 39 (App. Div. 1991)). Here, the State's plea agreement with Fernandez was disclosed to the jury and explored during direct and cross-examination. Defendant's and Caba-Placencia's counsel elicited testimony that Fernandez was only testifying for his own benefit and was lying about defendant's and Caba-Placencia's involvement in the robbery by highlighting Fernandez's prior inconsistent statements to police and in his affidavit to the prosecutor.

In addition, the jury was properly instructed on witness credibility – including about potential bias – and charged with the model jury charge for cooperating witnesses and inconsistent statements. We are satisfied that defendant's due process rights were not violated. Nor was the introduction of

23

Fernandez's testimony an error "clearly capable of producing an unjust result." R. 2:10-2.

D.

Defendant contends his discretionary twenty-five-year extended term sentence should be vacated or reduced because it was manifestly excessive. Specifically, he asserts the trial court erred by: (1) using the incorrect minimum of the sentencing range in its extended term analysis; (2) failing to conduct separate and distinct analyses for the extended term and N.J.S.A. 2C:44-1 factors; (3) double-counting his extensive criminal record in imposing an extended term and finding aggravating factors three, N.J.S.A. 2C:44-1(a)(3) and six, N.J.S.A. 2C:44-1(a)(6); and (4) failing to find any mitigating factors.

We review the trial court's sentencing decision under an abuse of discretion standard. State v. Jones, 232 N.J. 308, 318 (2018). A sentence will be affirmed "as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. Lawless, 214 N.J. 594, 606 (2013) (quoting State v. Natale, 184 N.J. 458, 489 (2005)).

To be accorded such deference, the trial court is required to "identify the relevant aggravating and mitigating factors, determine which factors are

24                                                                    A-1337-18T4

supported by a preponderance of evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989) (citations omitted); see also N.J.S.A. 2C:43-2(e); R. 3:21-4(g).

Defendant does not dispute he was eligible for an extended term. He contends rather that the sentence was improper because the trial court used the incorrect minimum of the sentencing range in its extended term analysis. In finding defendant was eligible for an extended term "based on [defendant's] background alone," the trial judge stated that the applicable sentencing range would change from "ten to [twenty] years to [twenty] to life, still with the restrictions of [NERA]."

The applicable sentencing range here was between ten years' imprisonment and life imprisonment. See N.J.S.A. 2C:43-6(a)(1), -7(a)(2). Defendant is correct that the judge misspoke when he said that the minimum sentence range for defendant's offenses was twenty years' imprisonment. Our Supreme Court has made clear that, while the "top" of the extended term range is the maximum sentence applicable to a persistent offender, a defendant need not be sentenced within the enhanced range. State v. Pierce, 188 N.J. 155, 169 (2006). Rather, "the permissible range has expanded so that it reaches from the bottom of the original-term range to the top of the extended-term range." Ibid.

The trial court sentenced defendant to an extended term of twenty-five years' imprisonment with an eighty-five percent parole disqualifier for the first-degree armed robbery conviction (count two) and a concurrent term of seven years for the second-degree conspiracy conviction (count one). In holding defendant was eligible for an extended term, the court implicitly found that a sentence in the ten to twenty years' imprisonment range was inadequate and sentenced defendant to twenty-five years' imprisonment, which was squarely within the correct sentencing range.

The sentencing court, in its sound judgment, still chooses a defendant's sentence "subject to reasonableness and the existence of credible evidence in the record to support the court's finding of aggravating and mitigating factors and the court's weighing and balancing of those factors found." Ibid. There is no rational basis to conclude that the trial judge would have sentenced defendant to a lower term simply because the bottom of the range was lower. Even if the trial court erred by misstating the minimum term, the error is not "clearly capable of producing an unjust result," and it is not a reason to disturb the sentence. See State v. Macon, 57 N.J. 325, 336 (1971); R. 2:10-2.

We briefly address defendant's remaining contentions regarding his sentence. The trial court found the imposition of an extended prison term

applicable due to defendant's extensive prior criminal record. He had six prior indictable convictions from 2007 to 2014, as well as several probationary and prison sentences. The court further noted defendant had violated his probation and his criminal activity had escalated over time, noting defendant "engaged in criminal activity . . . without fail every year [since 2005], except for the years when he was serving a prison sentence . . . ." He also had pending charges for burglary, weapons offenses and crimes against law enforcement officers.

The judge's application of aggravating factors three, six, and nine were supported by the evidence in the record. See N.J.S.A. 2C:44-1(a)(3), (6), (9). The judge also provided sufficient reasons supporting his finding that there were no mitigating factors. Because the trial court placed great weight on its finding of three aggravating factors, supported by the substantial facts and evidence in the record, and no mitigating factors, we are satisfied there was no abuse of discretion in the imposed sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1337-18T4